UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-cv-10145-RGS

PAUL J. MURPHY, Acting Regional Director,
Region 01, National Labor Relations Board, for and on
Behalf of the NATIONAL LABOR RELATIONS BOARD

v.

NSL COUNTRY GARDENS, LLC

MEMORANDUM AND ORDER ON PETITIONER'S
PETITION FOR TEMPORARY INJUNCTION
UNDER SECTION 10(j) OF NATIONAL LABOR RELATIONS ACT

May 10, 2019

STEARNS, D. J.

The National Labor Relations Board (NLRB or Board) brought this petition seeking a preliminary injunction pursuant to section 10(j) (29 U.S.C. § 160(j)) of the National Labor Relations Act (NLRA). The NLRB asks the court to compel NSL Country Gardens, LLC (NSL), to reinstate two members of the New England Healthcare Employees Union 1199, who also served as Union delegates. The NLRB claims that these former employees were discharged in retaliation for their union activities and that NSL's "for cause" justification for their firing is pretextual. The NLRB further asks the court to reinstate the collective bargaining agreement (CBA) from which NSL withdrew its recognition despite "continued majority employee support."

*See* Reply at 4; Pet. at 11.  The motion for injunctive relief is before the court based on an administrative record that closed on April 26, 2019.[1]  *See* Dkt # 20.  The court heard argument from the parties on May 8, 2019.

The factual background as gleaned from the record is as follows.  NSL operates a residential healthcare facility in Swansea, Massachusetts.  On July 3, 2016, NSL recognized the Union as the exclusive collective bargaining agent for the following two groups of employees, referred to as Unit A and Unit B.  Unit A consisted of

> [a]ll full-time and regular part-time Registered Nurses; excluding all other Employees, Director of Nursing, Supervisor of Nursing, Assistant Supervisors of Nursing, Food Service Supervisor, First Cook, Maintenance Supervisor, Housekeeping/Laundry Working Supervisor, Social Worker, other Professional Employees, Managerial Employees, Temporary Employees, Guards and Supervisors as defined in the Act.

Unit B was comprised of

> [a]ll full-time and regular part-time Licensed Practical Nurses, Nurses' Aides, Orderlies, Technical Employees, Kitchen Employees, Housekeeping Employees, Maintenance Employees, and Laundry Employees; excluding all other Employees, Registered Nurses, Director of Nursing, Supervisor of Nursing, Assistant Supervisors of Nursing, Food Service Supervisor, First Cook, Maintenance Supervisor, Housekeeping/Laundry Working Supervisor, Social Worker, Professional Employees,

---

[1] The NLRB's administrative hearings began on December 11, 2018, before Administrative Law Judge Geoffrey Carter. Hearings were held on December 12 and 13, 2018, and over fourteen days between February 4, 2019, and the closing date of April 26, 2019.

> Managerial Employees, Temporary Employees, Guards and Supervisors as defined in the Act.

As negotiated, the CBA was to be in effect from November 1, 2016, through October 31, 2018.

On July 6, 2018, NSL withdrew from the CBA after an apparent majority of the nursing home's employees signed a petition demanding that the Union be ousted "immediately." On July 9, 2018, NSL suspended Union delegate-employee Stephanie Sullivan, and, on July 11, 2018, discharged her, allegedly for leaving her work area on an unassigned break to solicit another employee on behalf of the Union. GC-SS1; Tr. 707. On July 16, 2018, NSL suspended delegate-employee Karen Hirst, and three days later terminated her for allegedly failing to report a patient-on-patient altercation. Tr. at 831; GC 61(e)-(f). After an investigation, the NLRB charged NSL with terminating Sullivan and Hirst for their steadfastness in support of the Union and as a warning to other employees who might be similarly inclined.

The issues presented by the Petition are: (1) whether there is reasonable cause to believe that NSL violated the NLRA when it withdrew recognition from the Union and discharged Sullivan and Hirst; and (2) whether interim injunctive relief is "just and proper." *Pye on Behalf of N.L.R.B. v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir. 1994). Section 10(j) of the NLRA provides that a Regional Director may petition a

federal district court for interim injunctive relief pending the NLRB's final resolution of an alleged unfair labor practice. *See McDermott ex rel. NLRB v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010). In considering a petition for interim relief under section 10(j), a district court's role is narrowly circumscribed. It "must limit its inquiry to whether (1) the Board has shown reasonable cause to believe that the defendant has committed the unlawful labor practices alleged and (2) whether injunctive relief is, in the words of the statute, 'just and proper.'" *Sullivan Bros. Printers, Inc.*, 38 F.3d at 63. "In assessing whether the Board has shown reasonable cause, the district court need only find that the Board's position is 'fairly supported by the evidence.'" *Id.*, quoting *Asseo v. Centro Medico del Turabo*, 900 F.2d 445, 450 (1st Cir. 1990) (noting that the issue is whether the NLRB's theory of a violation is substantial and not frivolous). The Board need not at the injunctive stage definitively prove that the alleged act constitutes an unfair labor practice; rather, the prayer should be granted unless the NLRB's legal or factual theories are "fatally flawed." *Silverman ex rel. NLRB v. Major League Baseball Player Relations*, 67 F.3d 1054, 1059 (2d Cir. 1995). The court should not attempt to resolve contested issues of fact, and rather defer to the Board's characterization of the facts so long as it is "within the range

of rationality." *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 158 (1st Cir. 1995).

At the second step of the inquiry, in deciding whether to grant injunctive relief,

> the Board faces a much higher hurdle, for here the district court must examine "the whole panoply of discretionary issues with respect to granting preliminary relief." Thus, the district court must apply the familiar, four-part test for granting preliminary relief. Under this test, the Board must demonstrate:
>
>> (1) A likelihood of success on the merits; (2) The potential for irreparable injury in the absence of relief; (3) That such injury outweighs any harm preliminary relief would inflict on the defendant; and (4) That preliminary relief is in the public interest.
>
> When . . . the interim relief sought by the Board "is essentially the final relief sought, the likelihood of success should be *strong*."

*Sullivan Bros. Printers, Inc.*, 38 F.3d at 63 (citations omitted and emphasis in original). Courts in this Circuit have customarily recognized the unlawful withdrawal of union recognition and the retaliatory termination of union employees as unfair labor practices for which §10(j) interim injunctive relief is appropriate. *See, e.g., Centro Medico*, 900 F.2d at 454-455; *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, at 26-27; *Pye ex rel NLRB v. YWCA of Western Massachusetts*, 419 F. Supp 2d 20, 22-23 (D. Mass. 2006); *Walsh v. Liberty Bakery Kitchen, Inc.*, 2017 WL 2837006, at *1 (D. Mass. June 30, 2017).

5

NSL, for its part, maintains that too many relevant considerations are "unexplored or insufficiently explored in the administrative record" to warrant the granting of section 10(j) relief. Opp'n at 4. It cites a number of mostly generic concerns: (1) the potentially adverse impact on employee morale in reinstating employees otherwise properly dismissed, *see* G*arcia v. High Flying Foods*, 2015 WL 773054, *20 (S.D. Cal. Feb. 12, 2015); (2) whether the discharged employees have secured alternative employment or desire to return to their former jobs, *see, e.g., McDermott v. Ampersand Publ'g LLC*, 2008 WL 8628728, at *13 (C.D. Cal. May 22, 2008); (3) whether the terminations have adversely impacted the willingness of the remaining employees to seek union representation, *see NLRB v. Prime Healthcare Servs.*, 2017 WL 2192970, at *5 (D. Nev. May 18, 2017); (4) whether the terminations have chilled the willingness of the remaining employees to file charges with the Board, *see NLRB v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 210 (7th Cir. 1989); (5) whether an order of reinstatement would result in the layoff of existing employees, *see McDermott*, 2008 WL 8628728, at *14; and (6) whether there has been any diminishing of the wages and benefits of existing employees attributable to the termination of the CBA, *see Osthus v. TruStone Fin. Fed. Credit Union*, 182 F. Supp. 3d 901, 913-914 (D. Minn. 2016). NSL also cites *McKinney v. Creative Vision Res., LLC*, 783 F.3d 293,

299 (5th Cir. 2015) ("[F]or purposes of § 10(j), a labor practice must lead to exceptional injury, as measured against other unfair labor practices" and "a district court . . . must issue specific findings of fact that suggest harm requiring § 10(j) injunctive relief.").[2]

This latter observation may be a bit of an overstatement. In this Circuit, the law places rather strict limits on the ability of a district court to make differential fact-finding decisions in a section 10(j) context. Rather, it must accept the Board's characterization of the facts so long as they fall "within the range of rationality." *Rivera-Vega*, 70 F.3d at 158. While this may be an instance of excessive *Chevron* deference, it is not for a district court to defy the governing standard.

Turning to the load-bearing wall of injunctive relief, I am satisfied that that there is substantial evidence in the administrative record to support the NLRB's finding of an unfair labor practice. Accepting the NLRB's factual characterizations as I must, the record portrays a not-so-subtle effort by NSL's Administrator, Jamie Belezarian, to instigate and abet a campaign by

---

[2] The NLRB represents that it advised NSL on April 17, 2019, that it could avail itself of the opportunity to present contrary "just and proper" evidence during the final three days of the administrative hearing in advance of this court's May 8 hearing but that NSL "inexplicably . . . failed to do so." Reply, at 2 n.3, citing *South Jersey Sanitation Corp.*, 2011 WL 5868413, at *1 n.1 (N.L.R.B. March 7, 2011).

7

April Birch, an anti-Union employee, to persuade fellow employees to decertify the Union. In addition to permitting Birch to collect signatures on a decertification petition during work hours and in work areas, Belezarian (to cite a few of the many instances in the administrative record) recruited other NSL managers to support Birch's petition drive, including then-Staff Development Coordinator Cassandra Sousa, then-Director of Nursing Heather Perry, then-Minimum Data Set (MDS) Coordinator Mallory O'Kane, then-Assistant Director of Nursing Katherine Minyo, and Nurse Supervisor Samantha Logan. *See* Tr. 83, 84-86, 155, 746-747, 810-813, 1490. Belezarian regularly complained that the Union was an impediment to retaining staff and managing the nursing home, that she wanted the Union out because it was "a thorn in her side," and that she had "ways" to accomplish that goal. Tr. 241-246, 297, 303-304, 313, 330, 356.

The timing and circumstances of the suspensions and terminations of Sullivan and Hirst, both of whom were long-time (30 plus years) employees at the home, are also suspect. While Birch was circulating the decertification petition, Sullivan made no secret of her support of the Union, extolling the benefits of union representation, handing out supporter buttons, and initiating a pro-Union counter-petition. GC 30; Tr. 673, 724, 748-749. Shortly after Belezarian confronted an employee wearing one of Sullivan's

Union buttons, Tr. 675, 815, she and Joe Veno, NSL's Vice President of Operations, called Sullivan into Belezarian's office. Tr. 705-706. They accused Sullivan of an unauthorized absence from her workstation and told her that she was being suspended pending an investigation. Tr. 707-708, 889.[3] Despite her vehement denials of the accusation, she was dismissed two days later. Tr. 720-722.

Like Sullivan, Hirst worked at NSL for more than 30 years. Tr. 942. She was also a long-time delegate for the Union. Upon learning of the decertification petition, and despite being on vacation, Hirst messaged several of her coworkers to voice her support for the Union. Tr. 960-965; GC KH-1. Within minutes of sending the message, Hirst was informed that Belezarian was displeased with her sending pro-Union messages to employees. Tr. 965. Believing that Stacy Hayes, Belezarian's sister-in-law, had shared the messages with her, Hirst sent Hayes a mouse emoji. A few days later, Veno charged Hirst with a failure to report an incident involving a patient altercation which she had testified she had not seen or known about. At least one employee was fired for her refusal to participate in

---

[3] Sullivan was issued a Disciplinary Action Report, which stated, "Solicitation & Distribution: Leaving work area on unassigned break to solicit another employee while the other employee also was not on an assigned break in a resident area (Dining Room)." GC-SS 1; Tr. 707.

management's "case against Karen . . . in order to terminate her." Tr. 833. Hayes and Activities Assistant Ariana Federici-McCarthy were asked by Belezarian to revise their statements to add that Hirst had observed the incident and that they had asked her to report it. Tr. 799. Despite the fact that three other employees initially wrote statements supporting Hirst's account of the incident, Tr. 799, 801-802, 831-832; GC 61(b)-(d) and (g)-(h), 840-841, she was terminated a few days later.

The remaining three injunctive factors also favor the Board. The prospect of irreparable harm to the Union from its enforced absence from the workplace is plain. As the First Circuit observed in a similar case, "there was a very real danger that if [the employer] continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective." *Centro Medico*, 900 F.2d at 454.[4] In this latter vein, there is evidence in the record supporting the Board's assertion that NSL "employees have suffered – and continue to suffer – the loss of just cause discipline protections, a grievance

---

[4] In another similar case, the Seventh Circuit recognized that "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996).

arbitration procedure, and health and safety protections, none of which can [be] remedied by a Board order in due course." Reply at 7. The harm to Sullivan and Hirst of having been summarily booted out of a life-long vocation is also plain. The balance of the hardships favors the Union because in the absence of injunctive relief, NSL will benefit from its unfair labor practices while the Union is forced to wait for reinstatement in an increasingly oppositional environment. Nor is an order to return to the bargaining table a satisfactory form of substitute relief. "[W]hen the [employer] is not compelled to do anything except bargain in good faith, the risk from a bargaining order is minimal." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1196 (9th Cir. 2011). The employer is not required "to do anything that would cause it harm; it need do nothing more than follow the ordinary obligations of an employer under the law." *Id.*

Finally, the public interest is served by injunctive relief in the sense that society, through Congress, has embraced the aims of the NLRA as furthering the goal of a just society. *Pan Am. Grain Co.,* 805 F.2d at 28.

ORDER

For the foregoing reasons, the petition for injunctive relief will be granted. The NLRB will submit as soon as practicable a proposed form of injunctive order for the court's approval, together with the affidavits of Sullivan and Hirst indicating whether they desire to be reinstated to their former positions at NSL.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE